UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| AROOSTOOK BAND OF MICMACS, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil No. 03-24-B-K |
| | ) | |
| PATRICIA E. RYAN, et. al, | ). | |
| | ) | |
| Defendants | ) | |

## MEMORANDUM OF DECISION ON CROSS MOTIONS FOR SUMMARY JUDGMENT[1]

These cross motions for summary judgment are back in front of me after the First Circuit Court of Appeals concluded that I erred in dismissing the Aroostook Band of Micmac's suit for declaratory and injunctive relief for want of jurisdiction.[2]  This action was brought by the Band against three former Band employees -- Lisa Gardiner, Tammy Condon, and Beverly Ayoob -- Patricia Ryan, the executive director of the Maine Human Rights Commission, and members of the Maine Human Rights Commission.  The Commission defendants, who pull the laboring oar for all the defendants,[3] are charged with vetting the employee claims of discrimination, a process that is a prerequisite to the filing of a civil action with a claim under the Maine Human Rights Act and/or the Maine Whistleblower Protection Act.

---

[1]    Pursuant to Federal Rule of Civil Procedure 73(b), the parties have consented to allow the United States Magistrate Judge to conduct any and all proceedings in this matter.

[2]    The First Circuit also concluded that the Band's count asserting that it was not subject to suit under Title VII should be affirmatively decided by the court on the merits.  Accordingly, I address the merits of this count below.

[3]    For the most part I refer to the Commission defendants as the Commission.  Former Band employees Gardiner and Condon are represented by the same counsel and have filed a one-page motion for summary judgment which requests that the court grant them summary judgment should the Commission defendants prevail.  Gardiner and Condon have also chimed in after the case was remanded by the First Circuit Court of Appeals, filing a supplemental brief and a reply brief on some of the substantive issues.

There are two pair of federal and state statutory schemes at issue in this dispute: The 1980 federal Maine Indian Claims Settlement Act (MICSA) which ratified the Maine Implementing Act (MIA), state legislation that worked settlements among the Penobscot Nation, the Passamaquoddy Tribe, The Houlton Band of Maliseet Indians, and the State of Maine, and the 1991 federal Aroostook Band of Micmacs Settlement Act (ABMSA) which followed in the wake of the 1989 state Micmac Settlement Act (MMSA).[4]

In these cross motions for summary judgment (Docket Nos. 36, 40 & 41) the parties dispute whether or not the terms of the MMSA, which clearly made the Band subject to state law,[5] can be given any effect.   As its central thesis the Band asserts that, no matter how the court slices these federal and state legislative enactments, the Band prevails because one rule, stemming from the federal common law of Indian self-government, must apply: State employment laws -- in this case the Maine Human Rights Act (MHRA) and the Maine Whistleblower's Protection Act (MWPA)[6] -- do not apply to tribal government employment.

## *Discussion*

As noted above, this case has already made one trip to the First Circuit Court of Appeals.  See Aroostook Band of Micmacs v. Ryan, 404 F.3d 48 (1st Cir. 2005).  That opinion provided a thorough summary of the Band's "particularly complex" relationship with the State, id. at 53.   Although the Panel never reached the merits of the Band's five

---

[4]      The Band uses the acronym "MMA" in referring to this act.

[5]      The Band does argue that even if the terms of the MMSA do apply to it, the act gives the state concurrent jurisdiction and that the State's employment discrimination laws should give way to the Band's interest as an employer.  The contours of this argument never crystalized.

[6]      MWPA claims are made actionable through the MHRA.  For simplicities sake I refer at times to these laws as Maine employment discrimination laws.

count complaint, see id. at 52 n.4, 61 n.19, the Panel's opinion set forth the legislative

history of the two pairs of state/federal legislative enactments:

### A. The 1980 Legislation

In the 1970s, two tribes--the Penobscot Nation and the Passamaquoddy Tribe-- filed suit claiming much of Maine as their ancestral homelands. See generally Penobscot Nation v. Fellencer, 164 F.3d 706, 707-08 (1st Cir.1999) (recounting history). Neither tribe was federally recognized at that point. The Aroostook Band of Micmacs was not represented by counsel at the time and was not a party to the litigation.[7]

In 1980, with the aid of the United States, the Penobscots and the Passamaquoddy reached a compromise with Maine. A third tribe, the Houlton Band of Maliseet Indians, which had not filed suit but was represented by counsel and had a potential claim, was later included in the compromise. See S.Rep. No. 101-291 (1990). The resulting settlement was embodied in the Maine Implementing Act, Me.Rev.Stat. Ann. tit. 30, §§ 6201-14; see also 25 U.S.C. § 1721(a)(8) ("The State of Maine, with the agreement of the Passamaquoddy Tribe and the Penobscot Nation, has enacted legislation defining the relationship between the Passamaquoddy Tribe, the Penobscot Nation, and their members, and the State of Maine."); Houlton Band of Maliseet Indians v. Me. Human Rights Comm'n 960 F.Supp. 449, 451-52 (D.Me.1997).

Under the Act--which affected "all Indians, Indian nations, and tribes and bands of Indians in the State," Me.Rev.Stat. Ann. tit. 30, § 6204, not just the named tribes--the Penobscots and the Passamaquoddy received somewhat more advantageous terms than the Maliseets. The Penobscots and the Passamaquoddy obtained territory and all the governmental rights and powers of municipalities within Maine. See id. §§ 6205, 6206, 6211. By contrast, the Maliseets received only land held in trust for them by the United States, and no municipal powers. See id. §§ 6205-A, 6206-A. In exchange for what the tribes received, and "partly as a result of the Tribes' disputed status, the State of Maine, as part of the settlement, obtained legal authority over the Tribes exceeding the usual state authority over native American tribes." Penobscot Nation v. Georgia-Pac. Corp., 254 F.3d 317, 320 (1st Cir.2001) ("Penobscot Nation II "), aff'g 106 F.Supp.2d 81, 82-83 (D.Me.2000) ("Penobscot Nation I "). Here, too, the tribes did not receive equally favorable treatment. For reasons that will become apparent later, we highlight the special status of the Maliseets. Before the passage of the Maine Implementing Act, neither Maine nor the United States had officially recognized the Maliseets, and Maine was reluctant to accord them special status. Instead, the Act subjected the

---

[7]  Here the Panel dropped the following footnote: "Apparently there was some confusion as to whether the Aroostook Band of Micmacs was distinct from the larger Canadian Band of Micmacs."  Id. as 53 n.8 (citing S.Rep. No. 101-291 (1990)).

Maliseets to Maine law to a greater degree than the Penobscots or the Passamaquoddy. The Maliseets were subject to a default clause applicable to all Indian tribes:

> Except as otherwise provided in this Act, all Indians, Indian nations, and tribes and bands of Indians in the State ... shall be subject to the laws of the State and to the civil and criminal jurisdiction of the courts of the State to the same extent as any other person or lands or other natural resources therein.

Me.Rev.Stat. Ann. tit. 30, § 6204. However, the Penobscots and Passamaquoddy benefit[]ed from an important exception: for those two tribes, "internal tribal matters, including ... tribal organization, [and] tribal government ... shall not be subject to regulation by the State." Id. § 6206(1). By contrast, the Maliseets received no such privilege. Rather, the Act emphasized that "[t]he Houlton Band of Maliseet Indians and its lands will be wholly subject to the laws of the State." Id. § 6202. Congress ratified the settlement through the Maine Indian Claims Settlement Act ("MICSA"), 25 U.S.C. §§ 1721-1735. Among MICSA's purposes were "to ratify the Maine Implementing Act" and "to confirm that all other Indians, Indian nations and tribes and bands of Indians now or hereafter existing or recognized in the State of Maine are and shall be subject to all laws of the State of Maine." Id. §§ 1721(b)(3)-(4). MICSA reiterated the distinction between the Maliseets and the other two tribes as to applicability of Maine law:

> Except as provided in [two provisions not relevant here], all Indians, Indian nations, or tribes or bands of Indians in the State of Maine, other than the Passamaquoddy Tribe, the Penobscot Nation, and their members ... shall be subject to the civil and criminal jurisdiction of the State, the laws of the State, and the civil and criminal jurisdiction of the courts of the State, to the same extent as any other person or land therein.

Id. § 1725(a).[8]

---

[8]    Here the Court dropped this footnote: "We have also assumed that MICSA implicitly incorporates into federal law the "internal tribal matters" exception of the Maine Implementing Act as it applies to the Penobscots and the Passamaquoddy." Id. at 54 n. 9(citing Penobscot Nation II, 254 F.3d at 320-21). The portion of Penobscot Nation II cited to reads as follows:

> Except as otherwise provided in this Act, the Passamaquoddy Tribe and the Penobscot Nation, within their respective Indian territories, shall have, exercise and enjoy all the rights, privileges, powers and immunities, ... and shall be subject to all the duties, obligations, liabilities and limitations of a municipality of and subject to the laws of the State, provided, however, that internal tribal matters, including membership in the respective tribe or nation, the right to reside within the respective Indian territories, tribal organization, tribal government, tribal elections and the use or disposition of settlement fund income shall not be subject to regulation by the State. Me. Rev. Stat. Ann. tit. 30 § 6206(1).

> In the federal Settlement Act, Congress did not expressly include the provision just quoted; but the Settlement Act did state, as "a purpose" of the statute, Congress' intent "to ratify" the Maine Implementing Act "which defines" the relationship between

**B. The Micmac Legislation**

In the years following the passage of MICSA, the Band, through counsel, raised its own claims with the state of Maine. In 1989, Maine and the Band reached a settlement that was memorialized in the Micmac Settlement Act, Me.Rev.Stat. Ann. tit. 30, §§ 7201-7207. The Act generally accorded the Band the same status as the Maliseets, not the greater powers and autonomy enjoyed by the Penobscots and the Passamaquoddy. See id. §§ 7203 (subjecting Band to state laws and court jurisdiction without exception), 7204 (land to be held in trust by United States), 7205 (no municipal powers for Band).

In 1991, at the behest of both Maine and the Band, Congress enacted the Aroostook Band of Micmacs Settlement Act ("Federal Micmac Settlement Act"), Pub.L. No. 102-171, 105 Stat. 1143 (codified at 25 U.S.C. § 1721 note). The Federal Micmac Settlement Act explained that "[t]he Band was not referred to in [MICSA] because historical documentation of the Micmac presence in Maine was not available at that time." Id. § 2(a)(2), 105 Stat. at 1143. Now that such documentation was available, Congress found that "[t]he Aroostook Band of Micmacs, in both its history and its presence in Maine, is similar to the Houlton Band of Maliseet Indians and would have received similar treatment under [MICSA] if the information available today had been available to Congress and the parties at that time." Id. § 2(a)(4). Consequently, the Federal Micmac Settlement Act aimed to "afford the Aroostook Band of Micmacs the same settlement provided to the Houlton Band of Maliseet Indians for the settlement of that Band's claims, to the extent [the Micmacs] would have benefited from inclusion in [MICSA]." Id. § 2(a)(5). On this basis, Congress "ratif[ied] the [state] Micmac Settlement Act, which defines the relationship between the State of Maine and the Aroostook Band of Micmacs." Id. § 2(b)(4), 105 Stat. at 1144.

Id. at 53-55.

---

the State of Maine and the Tribes. 25 U.S.C. § 1721(b)(3). This court has assumed, albeit without extensive discussion, that the internal affairs limitation on state authority in the Maine Implementing Act is also an overriding federal limitation on Maine authority over the Tribes. Akins v. Penobscot Nation, 130 F.3d 482, 485 (1st Cir.1997); see also 25 U.S.C. § 1735. The companies do not dispute that premise in this case.
254 F.3d at 320 -21.

**I.**

**A.      Count One – Application of the Maine Employment Discrimination Laws to the Band**

### 1. The Status of the Maine Micmac Settlement Act

The first question that must be answered to resolve these motions is whether or not the MMSA has any operative legal meaning in determining whether or not the Band is subject to the state employment discrimination laws.

The dispute about whether or not the MMSA is an effective law turns on the certification and non-modification provisions in the MMSA "effective date" provision. Section 4 of "An Act to Implement the Aroostook Band of Micmacs Settlement Act," P.L. 1989, ch. 148, passed at the First Regular Session of the 114th Legislature of the State of Maine, states:

> **Effective date.** This Act shall be effective only if: 1. The United States enacts legislation: A. Ratifying and approving this Act without modification; and B. Providing the consent of the United States for amendments to this Act, with respect to the Aroostook Band of Micmacs, provided that such amendment of this Act is made with the agreement of the Aroostook Band of Micmacs; and 2. Within 60 days of adjournment of the Legislature, the Secretary of State receives written certification by the Council of the Aroostook Band of Micmacs that the band has agreed to this Act, copies of which shall be submitted by the Secretary of State to the Secretary of the Senate and the Clerk of the House of Representatives, provided that in no event shall this Act become effective until 90 days after adjournment of the Legislature.

(Band SMF ¶¶ 58, 59; Comm'n Resp. Pl.'s  SMF ¶ 59, 59) (emphasis added).[9]

***Certification Requirement***

The Band argues that the MMSA is not a valid enactment because the Band never attempted to comply with the written certification requirement contained in an

---

[9]      The MIA did not include this certification requirement in its effectiveness provision.  See 30 M.R.S.A. § 6202.  It did include the anti-modification requirement.  See id.

amendment to this state settlement act.  The First Regular Session of the 114th Legislature of the State of Maine adjourned on July 1, 1989. (Band SMF ¶ 60; Comm'n Resp. Pl.'s SMF ¶ 60.)  The Secretary of State did not receive the written certification described in section 4(2) within sixty days of July 1, 1989. (Band SMF ¶ 61; Comm'n Resp. Pl.'s SMF ¶ 61.)   The Secretary of State has never received the written certification. (Band SMF ¶ 62; Comm'n Resp. Pl.'s  SMF ¶ 62.)[10]

The Commission contends that the only reason that the Band failed to send in the written certification is that the Band was never told about the certification requirement (which was inserted in an amendment) and the Band therefore did not know about the requirement. (Comm'n SMF ¶ 43; Band Dep. at 47-48, 52-53; Heald Dep. at  21-23, 33.) The Band complains that the Commission is mischaracterizing the Band's deposition testimony on this point.  (Band Resp. Comm'n SMF ¶ 43.)  According to the Band, Mary Philbrook, who was deposed as a representative of the Band, never testified that "the only

---

[10]     The Commission adds that on December 6, 2000, the Band's Chief, William Philips, sent a letter to Department of the Interior Solicitor John Leshy and Bureau of Indian Affairs Assistant Secretary Kevin Gover in which Chief Philips stated that the Band refused to certify its agreement with the state Micmac Settlement Act.   (Comm'n SAMF ¶ 6 & Ex. C.)   On March 29, 2001, Chief Philips sent a memorandum to, among others, Secretary of the Interior Gale Norton and Attorney General John Ashcroft, in which Chief Phillips states: "While the State of Maine, through the [state Micmac Settlement Act], tried to remove our sovereignty and jurisdiction, we did not consent to this legislation and stopped it from taking effect." (Comm'n SAMF ¶ 7 & Ex. D.)  In the March 29 memorandum, Chief Philips also states that the Band "declined to agree" to the state Micmac Settlement Act and that "the Tribe did not agree with the [state Micmac Settlement Act] and did not submit a certification to the Secretary of State," and Chief Philips refers to the Band's "refusal to agree" to the state Micmac Settlement Act. (Comm'n SAMF ¶ 8 & Ex. D.) In a February 18, 2002, memorandum, Chief Phillips states that the state Micmac Settlement Act "contained a provision requiring the Band must certify its agreement with the legislation, before the Act could take effect."  He then states that the "Band never certified the agreement due to unfavorable terms and the act never took effect."  (Comm'n SAMF ¶ 9 & Ex. E.)   In August 2000, the Band's counsel, Douglas Luckerman, submitted comments on behalf of the Band and another Indian tribe to the United States Environmental Protection Agency regarding a proposal to authorize the State to issue National Pollution Discharge Elimination System permits.  After discussing the state Micmac Settlement Act and the certification requirement, Mr. Luckerman stated that the Band "did not agree with the Micmac Statute and did not submit a written certification to the Secretary of State." (Comm'n SAMF ¶ 10 & Ex. F.)
        The Band does not dispute these five factual allegations but states that they are not relevant to whether or not the MMSA took effect and that the reason for the Band's non-certification is not a material fact. (Band Opp'n Comm'n SAMF ¶¶ 610; Philbrook Dep. at 52.)

reason the Band failed to send in the written certification is that the Band was never told about the certification requirement."  Philbrook simply testified that "[w]e didn't know about the certification." (Id.; Band Dep. at 48, 53.)  The Band contends that the reason why the Band failed to submit the written certification is not material. (Band Resp. Comm'n SMF ¶ 43; see also supra note 10.)

      The parties agree that the Band did not know about the certification requirement until 1997, when an employee of the State of Maine called one of the Band's employees to ask whether the Band had certified the Micmac Settlement Act.  (Comm'n SMF ¶ 44; Band Dep. at 42-44; Pl.'s Answer Interrog. 2; Band Resp. Comm'n SMF ¶ 44.) The Band, argues the Commission, does not know of any reason that it would not have sent in the written certification, had it known about the certification requirement. (Comm'n SMF ¶ 48; Band Dep. at 48.)  The Band rejoins again that in its view it is immaterial whether or not the Band would have approved the Act.  (Band Resp. Comm'n SMF ¶ 48.)   It repeats that the Band did not discuss or vote on the certification or approval of L.D. 272 after it was enacted (id.; Band  Dep. at 41, 53) and there is no evidence in the record to suggest that the Band would have approved the certification of MMSA especially given the State's  sweeping  interpretation of its authority over the Band under the act (Band Resp. Comm'n SMF ¶ 48).

      The Band cites to a legal opinion provided to the Maine Deputy Secretary of State with respect to a similar certification provision in the 1985 "Act Relating to the Time of Penobscot Nation Trust Land Acquisition."  That act required that the Penobscot Nation submit a certification of its agreement within sixty-two days of the adjournment of the legislature and the certification was submitted sixty-two days after the adjournment.   The

Attorney General's opinion was that the legislation was not effective and that the only remedy was a reenactment of the legislation.  (Band SMF Ex. H Attach. XI.)   In that opinion the Attorney General noted that it was "especially necessary to be strict in interpreting these provisions in that it deals with the question of land acquisition" and that it was important to forestall legal challenges by third parties that could cloud title.  (Id.; see also id. Attach XII.)

The authorities I found that are, at least somewhat, analogous to the deficiency in the enactment of MMSA supports the Attorney General's conclusion and the Band's position. These cases view similar consummative prerequisites as key to the legislation's validity.  See, e.g., State ex rel. Ashcroft v. Blunt, 696 S.W.2d 329, 331 (Mo. 1985) (en banc) ("The bill passed by the houses never reached the governor. It was inadvertently modified in route. ... This Court has no authority to speculate whether the governor would have signed the bill which passed the houses.");   State ex rel. Osborn v. City of McAllen, 91 S.W.2d 688, 690 (Tex.Comm'n App.1936) ("The authorities are in unison that where charters and statutes require it, submission to and approval by the mayor of ordinances or resolutions or certain classes thereof, after they have been passed by the council, are indispensable to their validity, except under circumstances specifically enumerated in the charters or statutes, such as failure of the mayor to act within a designated time after submission for approval or after passage over his veto.").  The certification by the governing body of the Band is not a mere ministerial act.  So, while the defendants assert that there was an implied certification because the Band assumed for years that the MMSA was effective, I could not find authority that swayed me that a court could in this

way finesse what is clearly the absence of a state legislative imposed precondition to the statute's valid enactment.

And, in a connected vein,  I do not view this certification shortfall as akin to cases dealing with long relied-upon, although invalid zoning ordinances which raise concerns about waiver, estoppel, or laches.  See Town of Florence v. Sea Lands, Ltd., 759 So.2d 1221, 1228-29 (Miss. 2000); Edel v. Filer Twp., 211 N.W.2d 547, 549-50 (Mich. App. 1973); Walker v. City of Biloxi, 92 So.2d 227, 229 (Miss. 1957);  City of Creston v. Center Milk Products Co., 51 N.W.2d 463, 465 (Iowa 1952).  The defendants do not mount a well-supported case for estoppel, beyond general discontent with the notion that the Band -- having agreed to the terms of the MMSA and thinking that the MMSA had indeed taken effect -- can now press this argument that it did not.[11]

### Non-modification Requirement

MMSA's effectiveness provision also required that the United States enact legislation ratifying and approving the state act "without modification."  The Band argues that there were at least three modifications of the state legislation worked by ABMSA.  It cites to § 5(c)(1) pertaining to land and natural resource condemnation and alienation, § 4(c) pertaining to taxation, and § 5(c) pertaining to the acquisition of land by the Band.[12]  My conclusion vis-à-vis the Band's failure to certify makes it unnecessary to explore this more nuanced concern regarding the effectiveness provision.

---

[11]     In terms of any unjust enrichment argument the settlement actually lifted a burden from the Maine taxpayers.

[12]     As discussed below, the Band believes the most glaring "conflict"  between the acts (as opposed to modification) is that between § 7205 of the MMSA and § 7(a) of ABMSA.  Section 7205 of the MMSA provides: "The Aroostook Band of Micmacs shall not exercise nor enjoy the powers, privileges and immunities of a municipality nor exercise civil or criminal jurisdiction within their lands prior to the enactment of additional legislation specifically authorizing the exercise of those governmental powers." 30 M.R.S.A. § 7205 (emphasis added).  Section 7(A) of ABMSA, on the other hand, provides as relevant: "The Band may organize for its common welfare and adopt an appropriate instrument in writing to govern

### *Congressional Ratification/Incorporation*

With respect to both of these challenges to the effectiveness of L.D. 272/MMSA the Commission and defendants Gardiner and Condon argue that Congress ratified the state act by enacting ABMSA. The Band concedes that it was Congress's intended purpose to ratify MMSA as set forth in ABMSA § 2(b)(4), and that, even in the absence of a substantive provision providing that the federal statute is ratifying the state act, this section and the legislative history might support a conclusion that there was an implied ratification. However, the Band maintains, the United States Congress simply cannot make effective a state law that is ineffective because of a failure to comply with a effectiveness provision of that state law that the state legislature enacted. I agree that Congress could not cure the defects in the MMSA effectiveness provision by enacting ABMSA, thereby making MMSA an effective <u>state</u> law.

A similar issue was addressed in <u>Kickapoo Tribe of Indians v. Babbitt</u>, a case involving a compact between the Governor of Kansas and the Kickapoo Tribe to allow gaming. The Secretary of the Interior ratified the compact but the District Court observed, "The fact that the compact is deemed approved, however, does not mean that the compact necessarily is binding and operational. Rather, as defendants next argue, even if the compact is deemed approved, it nonetheless may be void if the Governor's inability to bind the State of Kansas renders the compact invalid." 827 F.Supp. 37, 44 (D.D.C. 1993) <u>rev'd</u> <u>on</u> <u>other</u> <u>grounds</u> 43 F.3d 1491. The Court concluded that the compact was not binding, even though it is deemed approved by operation of statute. <u>Id.</u>

---

the affairs of the Band when acting in its governmental capacity. Such instrument and any amendments thereto must be consistent with the terms of this Act." 25 U.S.C. § 1721 note sec. 7(a). The Band describes this ABMSA provision as conferring the right to self-government without qualification. It would be possible to construe this "conflict" as a "modification," but I do not so construe it for purposes of this decision.

at 46.   The Tenth Circuit followed this reasoning in <u>Pueblo of Santa Ana v. Kelly</u>, 104

F.3d 1546, 1054-55 (10th Cir. 1997).  It also rejected the Tribe's assertion "that the

Governor's act of signing the compacts without authority was merely a voidable act,

which the Secretary of the Interior in essence 'cured' by approving the compacts."  Of

relevance to this dispute, <u>Pueblo of Santa Ana</u> refused to follow cases that "involve[d] an

unauthorized act which was subsequently ratified or approved by the body with clear

authority to ratify or approve the action" because "[t]hey do not support the argument that

a federal official can ratify or authorize an unauthorized state actor's conduct."  <u>Id.</u> at

1557.  <u>See</u> <u>also</u>  <u>Narragansett Indian Tribe of Rhode Island v. Rhode Island</u>,  Civ. A. Nos.

94-0618-T, 94-0619-T and 95-0034-T, 1996 WL 97856, 2 (D.R.I.  Feb. 13, 1996) ("For

present purposes, the only thing that need be said is that the "1994 compact" is void in the

same sense that any document executed without proper authority is void; namely, it has

no legal effect.").[13]

        There is no doubt that Congress did (and still does) have the power to enact

federal legislation which, despite the lack of an effective state law, included the terms of

that legislation in the federal act making those terms federal law.  And on this score, the

Band points out that Congress knew how to incorporate the provisions of a state

settlement act into the federal legislation as it did so in MICSA.  The Band notes that

MICSA § 1725(b)(1) provides:

            The Passamaquoddy Tribe, the Penobscot Nation, and their
        members, and the land and natural resources owned by, or held in trust for
        the benefit of the tribe, nation, or their members, <u>shall be subject to the</u>

---

[13]        In their supplemental brief defendants Gardiner and Condon argue Congress has the power to cure
defects in agreements when it ratifies agreements.  (Gardiner & Condon Suppl. Brief at 3-5.)  However,
what these defendants overlook is that Congress, although it has the power to "ratify" the MMSA by
incorporating its terms into ABMSA, it did not do so at the time of ABMSA's enactment and it has not
done so in the fourteen years since.

> jurisdiction of the State of Maine to the extent and in the manner provided
> <u>in the Maine Implementing Act</u> and that Act is hereby approved, ratified,
> and confirmed.

25 U.S.C. § 1725(b)(1) (emphasis added);  MICSA § 1725(d)(1) provides:

> The Passamaquoddy Tribe, the Penobscot Nation, and the Houlton
> Band of Maliseet Indians, and all members thereof, and all other Indians,
> Indian nations, or tribes or bands of Indians in the State of Maine may sue
> and be sued in the courts of the State of Maine and the United States to the
> same extent as any other entity or person residing in the State of Maine
> may sue and be sued in those courts; and section 1362 of Title 28 shall be
> applicable to civil actions brought by the Passamaquoddy Tribe, the
> Penobscot Nation, and the Houlton Band of Maliseet Indians: *Provided,*
> *however*, That the Passamaquoddy Tribe, the Penobscot Nation, and their
> officers and employees <u>shall be immune from suit to the extent provided</u>
> <u>in the Maine Implementing Act</u>.

25 U.S.C. § 1725(d)(1)(underscored emphasis added); and MICSA § 1725(f) provides:

> The Passamaquoddy Tribe and the Penobscot Nation are hereby
> authorized to exercise jurisdiction, separate and distinct from the civil and
> criminal jurisdiction of the State of Maine, to the extent authorized by the
> Maine Implementing Act, and any subsequent amendments thereto.

25 U.S.C. § 1725(f). ABMSA, in contrast, nowhere incorporates the terms of the MMSA

into ABMSA. <u>See</u> <u>supra</u> note 8.

Thus, despite the fact that Congress indicated that one of the purposes of ABMSA

was to "ratify the Micmac Settlement Act, which defines the relationship between the

State of Maine and the Aroostook Band of Micmacs," 25 U.S.C. § 1721 note § 2(b)(4),  I

conclude that ABMSA failed to make the terms of the MMSA which defined the

relationship between the Band and the State of Maine <u>federal</u> law.[14]

---

[14]     The process for deciding these motions for summary judgment has been not unlike solving a
complex mind teasing puzzle with respect to which there is more than one way to put the pieces together.
Given the high stakes for the Band and the State, I am sure that the question of whether each step in the
course I chose is correct will be put to the test.
         One of the other ways of solving this puzzle turns on whether or not the fact that Congress
indicated in § 2(b)(4) that one of the four purposes of ABMSA was to ratify the MMSA which defines the
relationship between the State and the Band creates a severability issue.   ABMSA's findings and policy
section also contains indications of this intent in sections 2(a)(4),(5).  As the First Circuit noted, while

### 2. The Federal Settlement Acts and the Band's Susceptibility to Suit Under the Maine Employment Laws

Having concluded that the Micmac Settlement Act is not a valid enactment the task remains to identify to what extent the Band is subject to the Maine Human Rights Act vis-à-vis its employment decisions.

In two passages that tee-up this issue, the First Circuit explained in its decision:

> Three provisions of the Federal Micmac Settlement Act are relevant here. First, the Act provides for self-governance: "The Band may organize for its common welfare and adopt an appropriate instrument in writing to govern the affairs of the Band when acting in its governmental capacity." Id. § 7(a), 105 Stat. at 1148.
>
> Second, despite Congress's stated desire to provide the Band with "the same settlement provided to the Houlton Band of Maliseet Indians for the settlement of that Band's claims," id. § 2(a)(5), 105 Stat. at 1143, the Federal Micmac Settlement Act does not explicitly subject the Band to Maine law. Section 6(b) of the federal act, entitled "Laws Applicable," subjects the Band to federal law on the same terms as the other Maine tribes. 105 Stat. at 1148. Nothing in the federal act explicitly subjects the Band to Maine law. By contrast, the earlier MICSA explicitly stated that all Indian tribes other than the Passamaquoddy and Penobscots "shall be subject to the civil ... jurisdiction of the State, the laws of the State, and the civil ... jurisdiction of the courts of the State, to the same extent as any other person or land therein." 25 U.S.C. § 1725(a); id. § 1721(b)(4).
>
> Finally, the federal act provided that "[i]n the event of a conflict of interpretation between the provisions of the [state] Maine Implementing Act [affecting the Penobscots, Passamaquoddy, and Maliseets], the [state] Micmac Settlement Act, or the [federal] Maine Indian Claims Settlement Act of 1980 and this Act, the provisions of this [Federal Micmac Settlement] Act shall govern." Federal Micmac Settlement Act § 11, 105 Stat. at 1149.

---

MICSA contained a severability clause, see 25 U.S.C. § 1734, ABMSA does not.  See Aroostook Band of Micmacs, 404 F.3d at 64 n.27.

The State articulated a severability argument in this second round of summary judgment pleadings arguing that if the MMSA is not effective Congress would have wanted the entire ABMSA to fail and have the Band's status revert to the terms of MICSA. (Comm'n Suppl. Br. Mot. Summ. J. at 8-11, Docket No. 93; see also Band Suppl. Reply Br. at 10, Docket No. 97.)  If the puzzle is solved in this fashion, obviously a very different outcome may result.  However, I am uncomfortable with the notion of reading an entire Congressional enactment out of existence, not because it is unconstitutional, but because one of its stated purposes has apparently failed.  Congress can easily remedy that failure by adopting the terms of the MMSA itself, if it chooses to do so.

404 F.3d at 55.

I come to the following conclusions apropos the applicability of the provisions of MICSA and ABMSA to the Band.  First, § 6(a) conferred federal recognition for the first time on the Band:

> **Federal recognition.**--Federal recognition is hereby extended to the Aroostook Band of Micmacs. The Band shall be eligible to receive all of the financial benefits which the United States provides to Indians and Indian tribes to the same extent, and subject to the same eligibility criteria, generally applicable to other federally recognized Indians and Indian tribes.

25 U.S.C. § 1721 note § 6(a).  Therefore, ABMSA is 'inconsistent' with MICSA as the Band was not granted federal recognition by MICSA.

Second, § 6(b) tethers the Band's federal recognition to MICSA:  "For the purposes of application of Federal law, the Band and its lands shall have the same status as other tribes and their lands accorded Federal recognition under the terms of the Maine Indian Claims Settlement Act of 1980."  Id.  § 6(b).   The Band's federal recognition is not, as the Band would have it, utterly apart from the special arrangement worked by Congress vis-à-vis the Maine Indian tribes. See Morton v. Mancari, 417 U.S. 535, 551 (1974) ("The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective. 'When there are two acts upon the same subject, the rule is to give effect to both if possible . . .. The intention of the legislature to repeal "must be clear and manifest."' United States v. Borden Co., 308 U.S. 188, 198 (1939).").  As the First Circuit stated in Aroostook Band of Micmacs, "Section 6(b) of the federal act, entitled 'Laws Applicable,'

subjects the Band to <u>federal</u> law on the same terms as the other Maine tribes."  404 F.3d at 63.   The implications of this limitation apropos the Band/State relationship may play out in a variety of ways given the nature of the dispute; I need only determine what they are with respect to state law suits for employment discrimination.

This brings me to the third step towards solving this puzzle.  Given this federal recognition worked by § 6(a), the simultaneous right to self-governance conferred in § 7(a), and the absence of any provision in ABMSA (spelled out within its text or through incorporation) that defines the extent to which the Band is subject to suit in Maine, compare 25 U.S.C. § 1725(b)(1), (d)(1), and (f) and id. § 1771c(a)(1)(A), (B);  see cf. Rhode Island v. Narragansett Indian Tribe, 19 F.3d 685, 702 (1st Cir. 1994) ("By its terms, the Settlement Act purposes to do no more than grant jurisdiction to the state; it does not expressly strip the Tribe of jurisdiction, transfer jurisdiction from the Tribe to the state, or employ suggestive adjectives like "exclusive" or "complete" in describing the jurisdictional grant."),[15] it would be inconsistent with ABMSA to conclude that the Band is subject to suit in the same manner as are the Maliseets.  For, the Maliseets are a Band which is expressly subject to suit the same as any other person in MICSA, as were other Maine tribes who were not federally recognized. See 25 U.S.C. § 1725(a).[16]

---

[15]     The First Circuit explained in Narragansett Indian Tribe:
> Given the strong congressional bias, especially noticeable in the past generation, against policies that would promote Indian assimilation, see Bryan [v. Itasca County, Minn.], 426 U.S. [373,] 387-88 & n. 14 [(1976)], and also given Congress's fortunate penchant for great clarity when expressing its intent in this area, see id. at 389 ("Congress kn[ows] well how to express its intent directly when that intent [is] to subject ... Indians to the full sweep of state laws."); Mattz v. Arnett, 412 U.S. 481, 504 n. 22 (1973) (observing that Congress generally employs "clear language of express termination when that result is desired") (collecting examples), we are of the view that acts diminishing the sovereign rights of Indian tribes should be strictly construed.

19 F.3d at 702.

[16]     If the court were to conclude that the MMSA was effective in any sense, the Band believes the most glaring conflict between MMSA and ABMSA is between § 7205 of the MMSA and § 7(a) of ABMSA.  Section 7205 of the MMSA provides: "The Aroostook Band of Micmacs shall not exercise nor

Accordingly, ABMSA §11 is triggered and, with respect to the Band's rights to self-

government, ABMSA's § 7(a) trumps MICSA § 1725(a).

Once again, § 7(a) ABMSA provides as relevant:

**"Sec. 7. Tribal organization.**

**"(a) In general.**--The Band may organize for its common welfare and adopt an appropriate instrument in writing to govern the affairs of the Band when acting in its governmental capacity. Such instrument and any amendments thereto must be consistent with the terms of this Act. The Band shall file with the Secretary a copy of its organic governing document and any amendments thereto.

25 U.S.C.A. § 1721 note § 7.[17]

MICSA contains the following self-governing provision:

The Passamaquoddy Tribe, the Penobscot Nation, and the Houlton Band of Maliseet Indians may each organize for its common welfare and adopt an appropriate instrument in writing to govern the affairs of the tribe, nation, or band when each is acting in its governmental capacity. Such instrument and any amendments thereto must be consistent with the terms of this subchapter and the Maine Implementing Act. The Passamaquoddy Tribe, the Penobscot Nation, and the Houlton Band of Maliseet Indians shall each file with the Secretary a copy of its organic governing document and any amendments thereto.

25 U.S.C. § 1726(a) (emphasis added).  The Band emphasizes that the underlined portion

of the MICSA self-government provision, in contrast to ABMSA, requires that the

---

enjoy the powers, privileges and immunities of a municipality nor exercise civil or criminal jurisdiction within their lands prior to the enactment of additional legislation specifically authorizing the exercise of those governmental powers." 30 M.R.S.A. § 7205. Section 7(A) of ABMSA, on the other hand, provides as relevant: "The Band may organize for its common welfare and adopt an appropriate instrument in writing to govern the affairs of the Band when acting in its governmental capacity. Such instrument and any amendments thereto must be consistent with the terms of this Act."  25 U.S.C. § 1721 note sec. 7(a). The Band describes this ABMSA provision as conferring the right to self-government without qualification.

[17]      The Indian Reorganization Act of 1934 contained the following provision apropos self-government which the Band describes as "virtually identical to ABMSA § 7(a)": "Any Indian tribe shall have the right to organize for its common welfare, and may adopt an appropriate constitution and bylaws, and any amendments thereto."  25 U.S.C.A. § 476(a).  In  Morton v. Mancari, the Supreme Court observed vis-à-vis this provision: "The overriding purpose of [Indian Reorganization Act of 1933]  was to establish machinery whereby Indian tribes would be able to assume a greater degree of self-government, both politically and economically.").  417 U.S. 535, 542 (1974).

Passamaquoddy Tribe, the Penobscot Nation, and the Houlton Band of Maliseets self-
govern in conformance with the MIA which contains the 30 M.R.S.A. § 6206(2) "sue and
be sued" provision ratified by MICSA's § 1725(a).  See Aroostook Band of Micmacs, 404
F.3d at 63-64 (summarizing this argument); see also id. at 64 n.25  ("We express no view
on whether the Federal Micmac Settlement Act's apparent differences from MICSA or
the Maine Implementing Act actually create an inconsistency, let alone a conflict to
which Section 11 of the Federal Micmac Settlement Act would apply. We simply note
that it may be necessary to resolve this question in determining the substantive reach of
Section 7(a) of the Federal Micmac Settlement Act.").

In order to determine what the right to self-governance conferred by § 7(a) means
with respect to the defendants' ability to investigate and/or sue the Band under the Maine
Human Rights Act for employment discrimination, I, as the Band urges, look to federal
common law. [18]  The Band contends that ABMSA § 7(a) should be read to prevent the
Commission defendants from pursuing employment discrimination claims under the
Maine Human Rights Act against them because these Commission investigations and
employee suits impermissibly interfere with the Band's right to self-government. [19]

---

[18]	Although the First Circuit's Penobscot Nation v. Fellencer addressed the "internal tribal matter" of
MICSA applicable to the Penobscot Nation, 164 F.3d 706, 713 (1st Cir. 1999), the Panel also made it clear
that Congress intended that federal common law should give meaning to the terms of MICSA. Id. at 712.  I
cannot see why the same would not hold true apropos ABMSA.

[19]	This question of course has yet to be litigated with respect to ABMSA when it is interpreted sans
the MMSA subject to suit provision.  Penobscot Nation v. Fellencer, 164 F.3d 706 (1st Cir.1999) (and
Akins v. Penobscot Nation, 130 F.3d 482 (1st Cir. 1997) in a non-employment discrimination context) dealt
with the "internal tribal matter" language of 30 M.R.S.A. § 6206(1) which was adopted by MICSA in 25
U.S.C. § 1725(d)(1) which contains the proviso that "the Passamaquoddy Tribe, the Penobscot Nation, and
their officers and employees shall be immune from suit to the extent provided in the Maine Implementing
Act."  The case discusses the concept of self-government but does not discuss it in the context of 25 U.S.C.
§ 1726(a).  Following Houlton Band of Maliseet Indians v. Maine Human Rights Commission, 960 F.Supp.
449, 453 (D.Me.1997), District Court Judge Brody, concluded in Boudman v. Aroostook Band of Micmac
Indians:

> As these provisions make clear, the Maliseet Indians are not subject to the
> "internal tribal matters" exception enjoyed by the Passamaquoddy and the Penobscot.

According to the Band, the § 7(a) self-government provision, unlimited in contrast to MICSA's § 1726(a) and MIA's § 6206(2), "reaffirms and codifies the common law doctrine of tribal sovereignty as it applies to the Band," Aroostook Band of Micmacs, 404 F.3d at 52 n.3.

The First Circuit's Aroostook Band of Micmacs decision discussed the breadth of the powers of tribal sovereignty when at its apex:

> Tribal "retained sovereignty predates federal recognition--indeed, it predates the birth of the Republic." Rhode Island v. Narragansett Indian Tribe, 19 F.3d 685, 694 (1st Cir.1994). "Because of their sovereign status, tribes ... are insulated in some respects by a 'historic immunity from state and local control,' and tribes retain any aspect of their historical sovereignty not 'inconsistent with the overriding interests of the National Government.' " New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 332 (1983) (citations omitted).
>
> When we speak of a tribe's sovereignty, we mean its powers as a government. At its apex, tribal sovereignty can include broad powers to determine the form of tribal government; to determine membership; to "enact substantive criminal and civil laws" that apply to tribal members within tribal territory; to regulate domestic relations, such as marriages and divorces, and "the descent and distribution of the property of tribal members"; to impose taxes; to operate court systems and administer justice; and to exclude persons from tribal territory. See Felix S. Cohen, Handbook of Federal Indian Law 246-52 (1982 ed.). Of course, not all tribes retain the full panoply of these powers today. A tribe retains those aspects of sovereignty that have not been "withdrawn by treaty or statute, or by implication as a necessary result of [the tribe's] dependent status." United States v. Wheeler, 435 U.S. 313, 323 (1978). Congress's broad powers over tribes are both "plenary and exclusive," United States v. Lara, 541 U.S. 193 (2004) (quotation marks and citation omitted), and "only

---

Since Congress has indicated that Defendant is to be treated like the Maliseet Indians, the Court concludes that, like the Maliseet Indians, Defendant cannot claim immunity from suit based on an asserted "internal tribal matters" exception, which extends only to the Passamaquoddy and the Penobscot. Fellencer, which dealt solely with the Penobscot and the "internal tribal matters" exception that was clearly applicable in that case, is simply inapposite.

54 F.Supp.2d 44, 48 (D. Me. 1999) (footnote omitted).  Judge Brody was not only not confronted with an argument that the MMSA did not take effect, he also was not presented with an argument that the self-governance provision of MICSA might prevent state employment discrimination suits despite the subject-to-suit provision.  In its motion for summary judgment the Commission noted that the Band has already litigated this question in Boudman (Comm'n Mot. Summ. J. at 16 n.9, Docket No. 36), however it has not pressed a claim or issue preclusion argument in these proceedings.

> Congress can abrogate or limit an Indian tribe's sovereignty," <u>Fellencer</u>,
> 164 F.3d at 709

<u>Id.</u> at 62.

The Panel recognized that § 7(a) was a codification of a right to self-governance.

<u>Id.</u> at 63 ("In addition to inherent sovereignty, the Band also asserts a statutory right to

self-governance codified in Section 7(a) of the Federal Micmac Settlement Act.").

Apropos this right to <u>self-government</u> under federal common law the Panel explained:

> One important aspect of tribal sovereignty is "the power of
> regulating [its] internal and social relations,' " which includes the "right of
> internal self-government." [United States v.] Wheeler, 435 U.S. [313,] 322
> [(1978)] (citation omitted). A tribe's power to "maintain or establish its
> own form of government .... is the first element of sovereignty." [S.
> Cohen,] <u>Handbook of Federal Indian Law</u>, [,] 247 [(1982 ed.)]. The form
> of tribal government "may reflect the tribe's determination as to what form
> best fits its needs based on practical, cultural, historical, or religious
> considerations." <u>Id.</u>

404 F.3d at 62.  Significantly, in a footnote to this passage the Panel noted:

> The phrase "tribal self-government" has been used in two distinct
> ways. In a broad sense, it can mean a tribe's power to regulate the conduct
> of tribal members. <u>See</u>, <u>e.g.</u>, <u>Wheeler</u>, 435 U.S. at 322 ("Their right of
> internal self-government includes the right to prescribe laws applicable to
> tribe members and to enforce those laws by criminal sanctions."). We do
> not understand the Band to claim that it has this power. A second,
> narrower sense means <u>the tribe's power to determine the structure and
> internal operations of the governing body itself.</u> <u>See</u>, <u>e.g.</u>, <u>Handbook of
> Federal Indian Law</u>, <u>supra</u>, at 247. This is the meaning we emphasize.

<u>Id.</u> at 62 n.21 (emphasis added).

Although focused on the "internal tribal matters" language of MICSA, <u>Fellencer</u>

also touched upon the concept of Indian self-government with respect to the Penobscot

Nation and made it clear that there is some overlap with respect to the concepts of

"internal tribal matters" and the right to self-government. Discussing the Congressional

decision to exempt Indian tribes from Title VII's definition of "employer," the Panel

noted that:  "The Supreme Court has characterized this exemption as 'Congress'

recognition of the longstanding federal policy of providing a unique legal status to the

Indians in matters of tribal employment,' and it characterized Congressional intent as a

'policy of furthering Indian self-government.'" 164 F.3d at 711 (quoting Morton v.

Mancari, 417 U.S. 535, 548, 551 (1974).[20]

In a footnote following up on the connection between the tribal right to self-

government and employment discrimination claims, the Fellencer Panel observed:

> Two circuits have extended this exemption to bar claims against
> Indian tribes based on the Age Discrimination in Employment Act
> (ADEA), 29 U.S.C. §§ 621-34, even though no similar express exemption
> is contained in the ADEA. These courts premised the implied exemption
> from federal court jurisdiction over age-based discrimination claims on the
> Indian tribes' right to self-government. See EEOC v. Fond du Lac Heavy
> Equip. and Const. Co., 986 F.2d 246, 249 (8th Cir.1993); EEOC v.
> Cherokee Nation, 871 F.2d 937, 938 (10th Cir.1989).

Id. at 711 n.4.

Since Fond du Lac Heavy Equip. and Const. Co. and Cherokee Nation other

Circuit Courts of Appeal have similarly concluded that the right to discharge employees

is a right implicating a tribe's right to self-govern and concluded that federal employment

related claims cannot be maintained against (self-governing) tribes even when there is not

express statutory exemption on par with Title VII.  See Snyder v. Navajo Nation, 382

F.3d 892, 895 (9th Cir. 2004) (Fair Labor Standard's Act claim); Taylor v. Alabama

Intertribal Council Title IV J.T.P.A., 261 F.3d 1032, 1034-35 (11th Cir. 2001) (42 U.S.C.

---

[20]    In support of its position, the Band argues that ABMSA's § 7(a) parallels § 476(a) of title 25, of
the Indian Reorganization Act which was at issue in Morton v. Mancari, 417 U.S. 535 (1974).  As relevant
that provision provides:  "Any Indian tribe shall have the right to organize for its common welfare, and may
adopt an appropriate constitution and bylaws, and any amendments thereto. . . ."  25 U.S.C. § 476(a).  The
Band also emphasizes Mancari's statement that: "The overriding purpose of that particular Act was to
establish machinery whereby Indian tribes would be able to assume a greater degree of self-government,
both politically and economically."  417 U.S. at 542.

§ 1981 racial discrimination in employment); <u>E.E.O.C. v. Karuk Tribe Housing Authority</u>, 260 F.3d 1071, 1080 (9th Cir. 2001) (Age Discrimination Employment Act).  I can identify no reason why the same would not hold true for <u>state</u> employment discrimination claims when a tribe has a common-law or equivalent statutory right to self-government.

In sum, there is no provision in either MICSA or ABMSA  - either expressly or through incorporation -- that subjects the Band to Maine employment discrimination laws.  Congress may have intended to include a sue and be sued provision in AMBSA, <u>see</u> 25 U.S.C. § 1721 note § 2(b)(4), but it did not accomplish this.

> If Congress enacted into law something different from what it intended, then it should amend the statute to conform it to its intent. "It is beyond our province to rescue Congress from its drafting errors, and to provide for what we might think ... is the preferred result." <u>United States v. Granderson</u>, 511 U.S. 39, 68 (1994) (concurring opinion). This allows both of our branches to adhere to our respected, and respective, constitutional roles. In the meantime, we must determine intent from the statute before us.

<u>Lamie v. U.S. Trustee</u>, 540 U.S. 526, 542 (2004).   Understandably the defendants would have this Court focus on the legislative intent, some of which clearly supports their position and conclude that the Band is subject to suit in the same manner as the Maliseets, but codifying that intent is a job for Congress and not this court. <u>See</u> <u>Conroy v. Aniskoff</u>, 507 U.S. 511, 518-19, 527-28 (1993) (Scalia, J., concurring) ("Judge Harold Leventhal used to describe the use of legislative history as the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends. ...  The language of the statute is entirely clear, and if that is not what Congress meant then Congress has made a mistake and Congress will have to correct it. We should not pretend to care about legislative intent (as opposed to the meaning of the law), lest we impose

22

upon the practicing bar and their clients obligations that we do not ourselves take seriously."); <u>Jaskolski v. Daniels</u>, 427 F.3d 456, 462 (7th Cir. 2005)("Boosting the level of generality by attempting to discern and enforce legislative 'purposes' or 'goals' instead of the enacted language is just a means to turn rules into standards.").[21]  Finally, following the First Circuit cues in <u>Fellencer</u> and <u>Aroostook Band of Micmacs</u>, I conclude that a fair reading of ABMSA's § 7(a) is that it is a codification of a common-law right of self-government which, at a minimum, protects "the tribe's power to determine the structure and internal operations of the governing body itself" and that this right encompasses employment decisions by the Band.

**B.     Count Two - The Band's Tribal Sovereign Immunity**

My conclusion that the Band's statutory self-governance rights preclude the defendants' efforts to investigate and sue the Band for state-law employment discrimination claims means that it is unnecessary for me to decide whether or not the Band could successfully assert a sovereign immunity right even if the federal acts had made the Band subject to suit as envisioned by MMSA. <u>See</u> <u>Aroostook Band of Micmacs</u>, 404 F.3d at 69.

**C.     Count Three - Title VII Exemption**

In Count Three of the Band's complaint the Band asserts that it is exempt from the definition of "employer" contained in 42 U.S.C. § 2000e(b) and that, therefore, Title VII is not applicable to it.   In <u>Aroostook Band of Micmacs v. Executive Director Maine Human Rights Commission</u>, 307 F.Supp. 2d 95, 106-07 (D. Me. 2004) I "apparently" concluded that there was no case and controversy apropos this count because the parties

---

[21]    This is not even a situation in which I would be attempting to divine the meaning of a Congressional provision or term actually enacted; here there is no provision <u>to</u> interpret.

agreed that the Band was exempt from Title VII investigations and actions and, therefore, viewed Count Three as moot. See Aroostook Band of Micmacs, 404 F.3d at 70 ("While the district court did not identify which branch of case or controversy doctrine supported its ruling, we understand it to have meant the dispute was moot.").

The First Circuit explained how this disposition was in error for the simple reason that the defendants were free to return to their "old ways.'" Id. at 70 (quoting United States v. W.T. Grant Co., 345 U.S. 629, 632 (1953)).   The Panel also found fault with my conclusion that the referral of these charges by the Commission could have no operative effect under the law given the conclusion of Boudman v. Aroostook Band of Micmacs, 54 F.Supp. 2d 44 (D. Me. 1999) -- relying on Shannon v. Houlton Band of Maliseet Indians, 54 F. Supp. 2d 35 (D. Me. 1999) -- that the Band was not a Title VII actionable employer.   The Panel explained:

> We read this as finding that the complaint does not allege an injury-in-fact for standing purposes. In other words, even if the Commission erroneously files an EEOC charge against the Band, such referral causes no cognizable injury. See generally Steir v. Girl Scouts of the USA, 383 F.3d 7, 14-15 (1st Cir.2004) (summarizing Article III injury-in-fact requirement).
>
>       We disagree. As a general rule, "[w]hen the suit is one challenging the legality of government action ... [and] the plaintiff is himself an object of the action .... there is ordinarily little question that the action ... has caused him injury, and that a judgment preventing ... the action will redress it." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561-62 (1992). The Band alleges two specific injuries from the Commission's filing of charges with the EEOC. First, the Band asserts dignitary harm: it is forced to defend itself to the EEOC when, it claims, Congress has shielded the Band from such investigations entirely. As the Band notes, if "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable  interest for purpose of standing," id. at 562-63, then repeated filing of arguably frivolous federal charges against an Indian tribe that Congress has expressly exempted from the law's reach also causes a cognizable injury. Similarly, if the loss of the right to litigate in the forum of one's choice is cognizable, see Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund, 500 U.S. 72, 77 (1991), superseded by statute on other grounds as stated in Parker v. Della Rocco, 252 F.3d 663,

666 n. 2 (2d Cir.2001), then so too is being forced to litigate in a forum where one is not required to appear at all.

Second, the Band asserts economic harm: it must respond to the charge and pay attorneys to argue that it is exempt. Even assuming that the EEOC immediately agrees with the Band and dismisses each case, repeatedly forcing the Band to defend obviously futile Title VII complaints makes it incur financial costs that qualify as a cognizable injury. Cf. P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 144-45 (1993) (holding that denial of motion to dismiss on Eleventh Amendment grounds is immediately appealable under collateral order rule, and explaining that "the value to the States of their Eleventh Amendment immunity ... is for the most part lost as litigation proceeds past motion practice").

Aroostook Band of Micmacs, 404 F.3d at 70 -71.

Section 2000e(b) of title 42 of the United States Code defines "employer" and expressly provides that "such term does not include... an Indian tribe." 42 U.S.C. § 2000e(b)(emphasis added).  The Commission does not dispute that the Band is not subject to Title VII.  (See Comm'n Mem. Mot. Summ. J. at 2 n.1, 41; Comm'n Opp'n Band Mot. Summ. J. at 7.)   Nothing in MICSA or AMBSA undermines the Band's claim that it is not an employer within the meaning of Title VII.   Per the statute's plain meaning that is uncontested here, I conclude that the Aroostook Band of Micmacs is not subject to suit under Title VII of the Civil Rights Act.[22]

---

[22]         Judge Brody reasoned in Boudman:

In Shannon v. Houlton Band of Maliseet Indians, 54 F.Supp.2d 35 (D.Me.1999), this Court determined that the Maliseet Indians are subject to Title VII's exemption of Indian tribes from its reach. In light of the statutory evidence, discussed above, that Defendant is to be treated like the Maliseet Indians, the Court concludes that Defendant also is exempt from Title VII. Where a complaint as amended could not survive a motion to dismiss, then the motion to amend is to be denied as futile. See Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir.1996) (motion to dismiss for failure to state a claim); Schock v. United States, 21 F.Supp.2d 115, 124 (D.R.I.1998) (motion to dismiss for lack of jurisdiction). Since amending the Complaint to add a Title VII claim would be futile, Plaintiff's Motion to Amend with respect to the Title VII claim is denied.

54 F.Supp.2d  at 48 -49.  I do not rely on this reasoning in reaching my conclusion because of my earlier conclusion that Congress did not enact legislation that provided that the Band should be treated like the Maliseets with respect to the ability of the Band to sue and be sued and because I do not see how the text of

**D.      Counts Four and Five – Title VII Exemption Preemption and the Maine Employment Laws' Definitions of "Employer"**

With respect to Count Four, the Band asserts: "To the extent that the respective definitions of 'employer' contained in the MHRA and the MWPA include Indian tribes, these definitions are inconsistent with the definition of 'employer' contained in Title VII and from Title VII itself." (Compl. ¶ 83.)  In Count Five the Band argues that it is not "a 'person'" within the meaning of either state employment act.  (Id. ¶¶ 89-93.)  There was little attention paid to these counts in this second round of summary judgment briefing and argument and it is fair to say that these two counts were, in a sense, "pled in the alternative" should the Band not meet with success on Counts One or Two. My conclusion that the Band cannot be sued under either the MHRA or MWPA because of its statutory right to self-government under ABMSA vitiates the need to address the legal issues generated by either of these counts.

## II.

**A.      The Dispute about the Constitutionality of 25 U.S.C. § 1725(h)**

As the parties joined the issues in this second round, the Commission made an alternative argument that § 6(b) of ABMSA subjects the Band to federal law to the same extent as the MISCA tribes.  The defendants then point to 25 U.S.C. § 1725(h) which provides:

> General laws and regulations affecting Indians applicable, but special laws and regulations inapplicable, in State of Maine
>
> Except as other wise [sic] provided in this subchapter, the laws and regulations of the United States which are generally applicable to Indians, Indian nations, or tribes or bands of Indians or to lands owned by or held

---

these particular state settlement acts (even assuming MMSA was valid) would have any impact on the Title VII exemption inquiry.

in trust for Indians, Indian nations, or tribes or bands of Indians shall be applicable in the State of Maine, except that no law or regulation of the United States (1) which accords or relates to a special status or right of or to any Indian, Indian nation, tribe or band of Indians, Indian lands, Indian reservations, Indian country, Indian territory or land held in trust for Indians, and also (2) which affects or preempts the civil, criminal, or regulatory jurisdiction of the State of Maine, including, without limitation, laws of the State relating to land use or environmental matters, shall apply within the State.

25 U.S.C. § 1725(h).  It is the Commission's argument that this provision means that federal common law, including the common law doctrines of tribal sovereignty (and presumably self-governance) do not apply within the State of Maine.  (Comm'n Defs.' Suppl. Brief at 18-19.)

The Band rejoins that such an interpretation would violate its rights under the Fifth Amendment of the United States Constitution, violate its constitutionally protected fundamental rights, violate the Indian Commerce Clause and the Non-Delegation Doctrine, and reverse the Supremacy Clause.  (See generally Band Mot. Reconsideration Order Denying Additional Brs.; Band Outline Suppl. Authorities.)

I reject the Commission's argument (and do not reach the constitutional question) because my conclusion as to why the Band cannot be sued under the Maine employment discrimination statutes is based on an interpretation of a Congressional statutory right to self-governance in § 7(a) of ABMSA.  And ABMSA expressly provides in § 11 that to the extent the ABMSA conflicts with any provision of MICSA, then the provisions of ABMSA govern.

**B.      The Status of the Three Ex-employee Defendants' Discrimination Actions**

In its decision the First Circuit recognized that the Band's complaint did not allege any unlawful activity on the part of Gardiner, Condon, or Ayoob, and that the Band was

not seeking relief as against them.   Aroostook Band of Micmacs, 404 F.3d at 72.   The

Panel assumed that these ex-employee defendants were joined pursuant to Federal Rule

of Civil Procedure 19(a)(2) "because they have an interest in the action and, arguably,

their  ability to protect that interest would be impaired without their participation." Id. at

72-73.  I now dismiss the actions of the Band against these three defendants as there does

not appear to be any relief requested as against them.

### *Conclusion*

Based upon the foregoing, I now direct the clerk to enter judgment for the

Aroostook Band of Micmacs on Counts I and III of the complaint.  I further permanently

enjoin Defendant Ryan and the Commission defendants from applying the Maine Human

Rights Act and the Maine Whistleblower's Protection Act against the Band because under

the provisions of 25 U.S.C. § 1721 note § 7(a) the Band enjoys a statutory right of self-

governance that prohibits the enforcement of state employment discrimination laws

against the Band.  In addition, I enjoin Defendant Ryan and the Commission defendants

from applying Title VII, 42 U.S.C. §§ 2000e through 2000e-17 to the Band and from

filing charges of discrimination against the Band with the Equal Employment

Opportunity Commission.  The remaining counts of the complaint and the remaining

defendants are dismissed as no further relief remains to be granted.

***So Ordered.***

December 5, 2005.

> /s/ Margaret J. Kravchuk
> U.S. Magistrate Judge